**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                              Plaintiff,<br>          v.<br><br>BRIAN WONG,<br><br>                              Defendant. | No. 22 Cr. 395 (ER) |

**SENTENCING SUBMISSION ON BEHALF OF DEFENDANT BRIAN WONG**

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, New York 10019

*Attorneys for Brian Wong*

Of Counsel:

David Oliwenstein
John Van Son

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

I.   BACKGROUND AND NATURE AND CIRCUMSTANCES OF THE OFFENSE ........ 2

II.  THE GOVERNMENT'S INVESTIGATION AND PROCEDURAL HISTORY ............ 3

III. SENTENCING GUIDELINES ................................................................................... 5

IV.  THE COURT SHOULD IMPOSE A NON-CUSTODIAL SENTENCE ....................... 5

    A.   Personal History and Characteristics .......................................................... 6

        1.   The Wong Family ............................................................................ 6
        2.   Brian's Educational and Professional Background.................................. 8
        3.   Brian's Post-Guilty Plea Conduct................................................. 9
        4.   Brian's Personal Characteristics ....................................... 10
        5.   Brian's Personal History and Characteristics Weigh in Favor of a
            Non-Custodial Sentence.............................................................. 11

    B.   The Need to Promote the Purposes of Sentencing................................. 11

    C.   The Need to Avoid Disparities ............................................................ 14

    D.   The Need to Provide Restitution........................................................... 18

    E.   The Section 3553(a) Analysis Weighs Heavily in Favor of a Non-Custodial
        Sentence ............................................................................................. 19

CONCLUSION................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Gall v. United States*,
552 U.S. 38 (2007)........................................................................................1

*Kimbrough v. United States*,
552 U.S. 85 (2007)........................................................................................6

*Pepper v. United States*,
562 U.S. 476 (2011)..................................................................................6, 11

*United States v. Blythe*,
No. 16-cr-1842 (S.D. Cal. May 25, 2018) ...............................................16

*United States v. Bonthu*,
No. 18-cr-237 (N.D. Ga. Oct. 17, 2018) .................................................16

*United States v. Brettschneider*,
832 F. App'x 14 (2d Cir. Oct. 16, 2020) .................................................15

*United States v. Catenacci*,
No. 21-cr-759 (N.D. Ill. Aug.. 3, 2022) ..................................................16

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008)....................................................................2, 6

*United States v. Chiang Yu*,
No. 17-cr-348 (D.N.J. Sept. 7, 2018) ......................................................16

*United States v. Corsey*,
723 F.3d 366 (2d Cir. 2013)....................................................................6, 17

*United States v. DeCinces*,
No. 12-cr-269 (C.D. Cal. Aug. 12, 2019) ................................................16

*United States v. DeFilippo*,
795 F. App'x 3 (2d Cir. Nov. 6, 2019) ....................................................15

*United States v. Goerhing*,
No. 5-cr-209 (S.D.N.Y. Nov. 22, 2006) ..................................................16

*United States v. Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012).............................................17, 18, 19

*United States v. Holzer*,
  No. 9-cr-470 (S.D.N.Y. Oct. 1, 2009)......................................................................16

*United States v. King*,
  No. 12-cr-390-1, 2013 WL 3466553 (E.D.N.Y. Mar. 27, 2013).................................9

*United States v. Leitch*,
  Nos. 11-cr-609, 11-cr-457, 11-cr-39, 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013)............. 12

*United States v. Patel*,
  164 F.3d 620 (2d Cir. 1998).........................................................................11

*United States v. Peltz*,
   No. 21-cr-154 (E.D.N.Y. Nov. 17, 2022) ...............................................................16

*United States v. Perez*,
  No. 17-cr-538 (D.N.J. Aug. 10, 2018) ..................................................................16

*United States v. Pike*,
  No. 17-cr-630 (S.D.N.Y. Mar. 1, 2022)..................................................................11

*United States v. Polos*,
  No. 15-cr-692, 2017 WL 495507 (S.D.N.Y. Feb. 6, 2017) ....................................15

*United States v. Rhodes*,
  No. 8-cr-806-02, 2010 WL 1254106 (E.D.N.Y. Mar. 29, 2010) ...........................14

*United States v. Richard Yu*,
  No. 17-cr-349 (D.N.J. Aug. 10, 2018) ..................................................................16

*United States v. Stewart*,
  No. 15-cr-287 (S.D.N.Y. May 4, 2016) ..................................................................15

*United States v. Thompson*,
  No. 19-cr-698, Dkt. No. 49 (S.D.N.Y. Feb. 4, 2021) ............................................17

*United States v. Tsai*,
  No. 19-cr-675 (S.D.N.Y. Jan. 17, 2020) ...............................................................15

## <u>Statutes and Codes</u>

United States Code,
Title 18, Chapter 3 ...........................................................................................4
Title 18, Section 1001 ....................................................................................14
Title 18, Section 1519 ....................................................................................14
Title 18, Section 3553 ...................................................................... *passim*

## Other Authorities

Barry Boss and Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It, Ohio St. J. Crim. Law. Vol*: 18:2: 605-631 (Spring 2021) ........................................ 18

*"The COVID Prison Project tracks data and policy across the country to monitor COVID-19 in prisons,"* (Mar. 24, 2023), available at: https://covidprisonproject.com/ ........ 11

Gary Kleck, et al., *The Missing Links in General Deterrence Theory*, 43 Criminology 623 (2005) ......................................................................................................................................... 13

Law 360, "NJ Man Cops to Insider Trading in Atty Info-Poaching Case," (Nov. 14, 2022), available at: https://www.law360.com/pulse/articles/1549285/nj-man-cops-to-insider-trading-in-atty-info-poaching-case ............................................................................. 12

United States Sentencing Comm'n, "The Past Predicts The Future: Criminal History and Recidivism of Federal Offenders," (Mar. 2017), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12 ........................................... 12, 13

## PRELIMINARY STATEMENT

Brian Wong is before the Court for sentencing after he pled guilty as an accessory after the fact to an insider trading scheme perpetrated in part by his younger brother Brandon.   We respectfully submit this memorandum to enable the Court to sentence Brian not solely for his crime, but for the person that he has been over the past 44 years.   *Gall v. United States*, 552 U.S. 38, 50 (2007).

Like many white collar defendants, Brian has no criminal history, has accepted full responsibility for his serious crime, and has already started to endure the severe lifelong consequences that attach to convicted felons.

But unlike many white collar defendants, Brian did not commit his crime from a position of power, trust, or privilege.  After immigrating to the United States as a seven-year-old boy, Brian resided in the working-class neighborhood of Canarsie, Brooklyn, where he lived in a three-bedroom apartment with twelve other members of the extended Wong family.  Unable to complete the eleventh grade, Brian dropped out of high school and found work at local Chinese restaurants and an electronics store.

Mindful of all that his parents had sacrificed so that Brandon and he could have a better life than prior generations of the Wong family, Brian wanted more for himself and a then-hypothetical future family.  Brian enrolled in night courses, and although it took him three attempts, Brian passed his GED examination (by one point) and earned his high school equivalency diploma.

Although rightfully proud of what he accomplished, Brian soon discovered that his GED would not open the doors that he wished to enter.  At the suggestion of a staffing agency, Brian enrolled in courses on Microsoft Office, which, in turn, enabled the staffing agency to place Brian in a temporary position at a bank.  That placement led to the beginning of Brian's 22-year career designing the aesthetic aspects of pitch decks for the bankers whom he supported.  Brian's crime

led to the end of this career that he worked so hard to make a reality.

The Sentencing Guidelines (the "Guidelines") range, increased 14 levels based on "losses" not borne by any investor, accounts for none of this.  Nor does it account for the fact that Brian is a loving father to his 15-year-old daughter, a devoted son to his parents (including his father who is battling stage four lung cancer), and a fundamentally good and kind person.

Taking all of this into account, as Brian respectfully asks this Court to do on his day of judgment, we submit that a sentence of probation, accompanied by community service, is "sufficient but not greater than necessary to fulfill the purposes of sentencing."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (quoting 18 U.S.C. § 3553(a)).

## I.     BACKGROUND AND NATURE AND CIRCUMSTANCES OF THE OFFENSE

In the early phases of the COVID-19 pandemic, Brian started day trading securities on the recommendation of a friend.  Between February 22 and 24, 2021, Brian purchased Pandion Therapeutics, Inc. ("Pandion") stock following communications, sent via the messaging application WhatsApp, with his brother Brandon Wong.  After Merck's acquisition of Pandion was announced on February 25, Brian generated approximately $403,000 in profits.  Although the Government did not charge Brian with insider trading, Brian accepted responsibility for this conduct in an enforcement action instituted by the U.S. Securities and Exchange Commission (the "SEC").

Following the February 25 announcement, Brian learned that his brother generated over $1.4 million in trading profits and that his brother shared information regarding Pandion with other individuals.  On or around the same day, Brandon Wong started deleting certain WhatsApp communications with his brother regarding Pandion.  For communications that Brandon sent to Brian, the WhatsApp platform enabled Brandon to delete those messages on the accounts of both brothers.  For communications sent from Brian, Brandon could only delete those on his own

account.  Concerned about consequences that Brandon might face in the wake of the announcement, Brian deleted certain text messages that Brandon was not able to delete.

Likewise motivated by a desire to help his brother, Brian made false statements regarding Pandion to Special Agents from the Federal Bureau of Investigation ("FBI") when they interviewed him at his home on November 18, 2021.  In total, Brian generated approximately $403,000 in unlawful profits from his conduct.  Brian agreed to forfeit these gains and has already paid $100,000 prior to sentencing.

## II.    THE GOVERNMENT'S INVESTIGATION AND PROCEDURAL HISTORY

In the early morning hours of November 18, 2021, FBI Special Agents executed search warrants and served grand jury subpoenas at the homes of multiple individuals in connection with an investigation regarding trading in Pandion stock.  Those individuals included Brian, his brother and co-defendant Brandon, and co-defendant Seth Markin, as well as friends and relatives of all three defendants.

Pursuant to the search warrant issued in relation to Brian's home, the FBI agents seized Brian's iPhone.  Brian was also interviewed by the agents and made statements regarding Pandion, his communications regarding the company, and his securities trading.  He also produced to the Government all documents responsive to its grand jury subpoena.

At the request of the Government, Brian provided his iPhone password to enable analysts with the FBI Laboratory to retrieve all relevant electronically stored information.  Without a request from the Government, Brian retained Setec Investigations, a forensic firm that specializes in electronic discovery, to collect all available relevant data (e.g., messages, emails, social media) from all of Brian's personal devices.  Brian provided the Government with all responsive data that Setec was able to collect.

On July 21, 2022, the Government filed a thirty-one count indictment charging Markin and

Brandon Wong with conspiracy, securities fraud, tender offer fraud, and false statements (Markin only).  Dkt. No. 1.  Markin and Brandon Wong were arrested and arraigned on the indictment on July 25, 2022.  Dkt. Nos. 7-8.

Both prior to and following the arrests of his co-defendants, Brian, through counsel, engaged in discussions with the Government regarding the appropriate resolution of its investigation in relation to him.  On September 15, 2022, the Government indicated that it intended to charge Brian.  Just days later, on September 20, Brian conveyed his intention, through counsel, to resolve this matter pre-charge.  The parties executed a plea agreement on November 9, 2022, which was subsequently filed with the Court.

On the morning of November 10, Brian surrendered to Special Agents in lower Manhattan.  Brian was arrested, handcuffed, and processed at the FBI's field office before being transported to the Courthouse where he was detained at the Pretrial Services Office.  Later that afternoon, Brian was presented before Your Honor for arraignment, waived indictment, and pled guilty to a one-count superseding information charging him with accessory after the fact to conspiracy to commit securities fraud and tender offer fraud in violation of 18 U.S.C. § 3.

That same day, the SEC filed an enforcement action against Brian regarding his trading in Pandion stock.  As with this prosecution, Brian resolved the SEC matter pre-charge, consenting to the entry of a judgment regarding liability and the issuance of a permanent injunction.  At the SEC staff's request, Brian agreed to bifurcate the determination of monetary relief in the SEC matter, including disgorgement of trading profits (which we believe will be satisfied by an order of forfeiture entered in this matter) and the imposition of civil monetary penalties.  Brian also understands that the SEC staff intends to institute an administrative proceeding against him to bar him from associating with a broker-dealer or any other SEC-regulated entity.

### III.    SENTENCING GUIDELINES

Pursuant to a plea agreement dated November 9, 2022, the Government and Brian stipulated to the following:

- The November 1, 2021 edition of the Guidelines applies to Brian's sentence.

- Pursuant to § 2X3.1, the Guideline for Accessory After the Fact is calculated using the Guideline for the underlying offense (i.e., conspiracy to commit securities fraud and tender offer fraud).

- Under §§ 2B1.4 and 2X1.1(b)(2), the base offense level for the underlying conspiracy is eight because the substantive offense was completed.

- Pursuant to §§ 2B1.4(b)(1) and 2B1.4(b)(1)(H), because Brandon Wong's trading profits were greater than $550,000 but less than $1,500,000, 14 levels are added.

- The offense level for the underlying offense governed by § 2B1.4(b)(1) is 22.

- Pursuant to § 2X3.1(a)(1), the base offense level for accessory after the fact is six levels lower than the offense level for the underlying offense.  Accordingly, the base offense level is 16.

- Because Brian has clearly demonstrated his acceptance of responsibility, beginning months before he surrendered to FBI agents, a 2-level reduction is warranted pursuant to § 3E1.1.(a) for Acceptance of Responsibility.

- Because Brian permitted the Government to avoid preparing for trial and permitted the Government and the Court to allocate their resources efficiently—by accepting responsibility, agreeing to a resolution pre-charge, surrendering to the FBI, waiving discovery, waiving indictment, consenting to the filing of a superseding information, pleading guilty, and agreeing to forfeit his gains—Brian is eligible for an additional 1-level reduction pursuant to § 3E1.1(b).

Brian's applicable Guidelines offense level is thus 13.  The corresponding advisory Guidelines range is 12 to 18 months' imprisonment and a fine between $5,500 and $55,000, pursuant to § 5E1.2.

### IV.    THE COURT SHOULD IMPOSE A NON-CUSTODIAL SENTENCE

In imposing a sentence, a district court must consider the sentencing factors enumerated in 18 U.S.C. § 3553(a).  Those factors support the imposition of a non-custodial sentence against

Brian.

The purpose of the Section 3553(a) analysis is to derive a sentence that is "sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in Section 3553(a)(2). *Kimbrough v. United States*, 552 U.S. 85, 111 (2007); *United States v. Corsey*, 723 F.3d 366, 376 (2d Cir. 2013). This Court should not "presume that a Guidelines sentence is reasonable." *Cavera*, 550 F.3d at 189 (citations omitted). Such a presumption would be particularly inappropriate where, as here, the primary determinant of the Guidelines range—loss amount—is, at best, a poor barometer of a defendant's culpability. *See infra* at 19-20.

As reaffirmed by the Supreme Court, "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 477 (2011) (internal quotation marks and citation omitted); *see also Cavera*, 550 F.3d at 188 (*en banc*) ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."). Considering both Brian as a person and the crime for which he is now before the Court, we respectfully submit that a sentence of probation and community service is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## A.     Personal History and Characteristics

### 1.     The Wong Family

Brian's journey begins in Hong Kong, on August 27, 1978, where he lived with his parents and brother Brandon. Presentence Investigation Report ("PSR") ¶¶ 36, 38. In the mid to late 1970s, Brian's grandmother and other members of Brian's extended family immigrated to the United States, and Brian and his immediate family followed shortly thereafter. *Id.*

The Wong family settled in the working-class neighborhood of Canarsie, Brooklyn, where they lived with Brian's grandmother as well as several aunts, uncles, and cousins. *Id.* ¶ 39. Collectively, 13 members of the Wong family, including Brian, lived together in a three-bedroom

apartment.  Between approximately 1986 and 1996, the Wong family moved between several small apartments scattered around Canarsie and Bensonhurst.  *Id*. ¶¶ 39-40.  In 1997, Brian's immediate family was afforded, via a randomized lottery process, a two-bedroom apartment in an affordable housing development sponsored by New York City's Department of Housing Preservation and Development.  Brian resided in that Manhattan apartment until 2007, when he moved to Secaucus, New Jersey with his life partner, Janet Thai.  *Id*. ¶¶ 40-42.

Brian met Janet in or around 1999 at an optical store that employed Brian's father as a technician.  Although not recognized by the State of New Jersey, Brian and Janet's relationship is the functional equivalent of a common law marriage.  For all practical purposes, Brian and Janet have held themselves out as a married couple following their traditional Chinese tea ceremony in 2008.  *Id*. ¶ 41.  As one of many severe consequences of his crime to date, Brian's conduct has strained their relationship.  *Id*.  Brian accepts full responsibility for the impact of his behavior on his family, and is committed to repairing his relationship with Janet, if possible.

Despite his recent struggles, Brian's life revolves around his family, especially his 15-year-old daughter HW.  As explained by Brian's uncle, Brian is a "doting father" to HW.  *See* Ex. A at 8.  Although Brian has shared the nature of this proceeding with family and friends, as a protective father, Brian has tried to shield HW from the repercussions of his conduct.  *See* PSR ⁋ 41.

In addition to raising his daughter, Brian also devotes substantial time to caring for his aging parents.  Sadly, Brian's father was diagnosed with lung cancer shortly before the COVID-19 pandemic, which rapidly progressed to stage four disease.  *Id*. ¶ 36.  As explained by Brian's uncle (who is also a physician), "Brian is his father's liaison with the medical team due to his father's limited English."  *See* Ex. A at 9.  In light of the serious charges pending against Brandon Wong (who currently resides with Mr. and Ms. Wong), we anticipate that Brian's caretaking

responsibilities may become more important to the Wong family in the near future.

2.     <u>Brian's Educational and Professional Background</u>

When the Wong family arrived in the United States, Brian's parents enrolled him in his local public elementary school. Although Brian had completed several years of schooling in Hong Kong, Brian was placed in a first-grade classroom due to his difficulties learning English. From 1986 through 1996, Brian attended elementary, middle, and high school in Canarsie. PSR ¶ 52.

School did not come easy to Brian. Brian had difficulty concentrating in class and dropped out of Canarsie High School prior to completing the eleventh grade. Because Mr. and Ms. Wong "were working all the time" (*id*. ¶ 52) in order to provide for Brian, his brother, and the extended Wong family, Brian's parents had limited capacity to support his studies. Unfortunately, stressors impacting the Wong household would, at times, result in Brian being subjected to physical abuse as a consequence for his poor academic performance. *Id*. ¶ 39.

After dropping out of high school, Brian tried to support himself by working at an electronics store and various Chinese restaurants in Brooklyn. *Id*. ¶ 59. Brian also attempted, on multiple occasions, to obtain a high school equivalency diploma. *Id*. ¶ 53. Although his first two efforts were unsuccessful, Brian achieved a passing score—by one point—on his third and final attempt. *Id*.

Equipped with his GED, Brian began his search for employment through a staffing agency, which was initially unable to identify any opportunities for him. Eventually, the agency suggested that Brian enroll in vocational training including classes on Microsoft Office. *Id*. ¶ 54. In or around 2000, the staffing agency was finally able to place Brian in a support role at an investment bank. *Id*. ¶ 58. In that role, Brian was responsible for designing the aesthetic aspects of presentations used by the bankers whom he supported. *Id*. ¶¶ 56-58.

Brian held similar roles at other banks, generally on a temporary basis. *Id*. In or around

May 2014, Brian learned that another financial institution was seeking a full-time employee with his skillset.  *Id*. ¶ 56.  Brian applied and was hired.  As with the other banks at which he worked, Brian was responsible for "supporting bankers that submitted jobs to edit documents, create charts, and create pages to reflect the [bank] format."  *Id*.

 On November 16, 2022—six days after his guilty plea—Brian's employment was suspended and then subsequently terminated.  *Id*.  The resulting loss of income is no small consequence for Brian and his family.  But in light of his protracted and difficult pathway to procuring employment, Brian also lost a profound source of personal pride.

3.    <u>Brian's Post-Guilty Plea Conduct</u>

Brian realizes that the opportunities for which he worked so hard to achieve are now permanently foreclosed to him.  As a result of his crime, guilty plea, judgment in the SEC's parallel enforcement action, and the SEC's forthcoming administrative proceeding, Brian will never again work in a support function at a bank.

In the weeks following his guilty plea, Brian began volunteering at MedShare, a humanitarian organization devoted to delivering surplus medical supplies in the United States to communities in need around the world.  Brian has found this work to be meaningful and rewarding (particularly in light of his father's illness), which we respectfully request the Court to consider in fashioning an appropriate sentence.

Following his termination, Brian immediately applied for work as an Uber driver.  *Id*. ¶ 55.  In an effort to support his family and make further progress toward his forfeiture obligation, Brian drives seven days per week.  *See United States v. King*, No. 12-cr-390-1, 2013 WL 3466553, at *2 (E.D.N.Y. Mar. 27, 2013) (imposing sentence of time served well below Guidelines range where defendant obtained employment after his arrest).  Due to the substantial financial pressures that Brian's family now faces, when not caring for HW or assisting his parents, Brian spends virtually

9

all of his waking hours driving for Uber.

    4.    <u>Brian's Personal Characteristics</u>

Regardless of the conduct that brings him before the Court for sentencing, Brian is a fundamentally good person.  The people who know him best invariably describe him as "a wonderful human being."  Ex A at 7.  He is a loving father, caring husband, and devoted son.  But Brian's generosity with his time and resources extends beyond the immediate Wong family. Brian's uncle recounts an anecdote in which his son (Brian's younger cousin) "was in a need of a car to get back and forth to college."  Ex. A at 8.  According to Brian's uncle:

> Brian "sold" him a used car that he had for $1000 so that my son Matthew would not just be gifted a car.  But Brian had the oil, brakes and tires changed before handing over the car to make sure it was safe and that he would not have any imminent repair costs.  This cost more than what he charged for the car.

Ex. A at 8.

Brian's friends describe him in similar terms.  A friend who has known Brian for over ten years characterizes him as "reliable, responsible, and always willing to offer a helping hand."  Ex. A at 6.  That same friend notes that his "kids are always wondering when they are going over to [Brian's] house as he spends his time interacting with them in positive ways."  *Id*.  And despite Brian's personal challenges with schooling, Brian instills in HW and the children of his family and friends the importance of education including by providing them with "multiple education videos geared towards children for them to use and study."  *Id*.

As noted by both the Probation Office and members of his support system, Brian is "remorseful for this crime."  PSR ¶ 17; Ex A at 7.  And as both his lack of criminal history and those individuals who know Brian best make clear, Brian's crime was aberrational and not reflective of his productive life.  For these reasons, Brian's supporters implore the Court to "please allow Brian to make it right and give him a second chance."  Ex A at 7.

5.     Brian's Personal History and Characteristics
Weigh in Favor of a Non-Custodial Sentence

A consideration of who Brian is as a person—and not merely his crime—supports a sentence of probation and community service.  *See Pepper* 562 U.S. at 477.  In evaluating Brian's personal history and characteristics, *see* 18 U.S.C. § 3553(a)(1), we respectfully ask the Court to consider the totality of Brian's life including his personal background, devotion to his family, lack of criminal history, recent community service, and the severe personal, professional, and financial consequences that Brian will continue to endure for the remainder of his life.

As the Probation Office recognized, Brian's "familial responsibilities" are one of several "variance factors to consider in the sentencing of this defendant."  PSR ¶ 83.  Their conclusion, presumably based on Brian's devotion to raising his daughter and caring for his ailing father, is well grounded in the law of the Second Circuit.  *See, e.g.*, *United States v. Patel*, 164 F.3d 620, at *3 (2d Cir. 1998) (quoting *United States v. Sprei*, 145 F.3d 528, 535 (2d Cir. 1998) (upholding downward departure to enable defendant to care for wife suffering from hypertension, respiratory illness, asthma, and anxiety)).  Your Honor has recently recognized family care obligations as a basis for a variance, and we respectfully request that the Court do so here.  *See United States v. Pike*, No. 17-cr-630 (S.D.N.Y. Mar. 1, 2022) (imposing sentence of probation and location monitoring on first-time offender who participated in fraud conspiracy and lied to law enforcement).[1]

**B.     The Need to Promote the Purposes of Sentencing**

Imposing a non-custodial sentence comports with the four objectives of sentencing

---

[1]  Because of his father's medical condition, Brian continues to take significant measures to protect against contracting COVID-19, including wearing a mask while working as an Uber driver.  We understand that if Brian is sentenced to a term of incarceration, the risk inherent in the prison environment will preclude his parents from visiting him. *See* "*The COVID Prison Project tracks data and policy across the country to monitor COVID-19 in prisons*," (Mar. 24, 2023), available at: https://covidprisonproject.com/.

memorialized in 18 U.S.C. § 3553(a)(2).  *First*, a sentence of probation and community service is sufficient, but not greater than necessary, "to promote respect for the law, and to provide for just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  Probation constitutes a severe deprivation of liberty and is a serious punishment for a crime.  *United States v. Leitch*, Nos. 11-cr-609, 11-cr-457, 11-cr-39, 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013) ("[A]s the Supreme Court has recognized, probation is *significant* punishment.") (emphasis in original).  In recognition of that reality, courts have routinely imposed sentences of probation under circumstances similar to those of this case.  *See infra* at 14-18.

*Second*, a non-custodial sentence is sufficient to accomplish the twin goals of deterrence. *See* 18 U.S.C. § 3553(a)(2)(B).  With respect to specific deterrence, Brian has already suffered profound and lifelong consequences as a result of his crime.  His conduct, broadcast to the world on the day of his guilty plea,[2] has brought shame on himself and on the Wong family, including on his parents who immigrated to the United States with the dream of creating a better life for the brothers.  Brian has lost his career and brought hardship on himself and his family.  Brian is also facing further punishment in parallel SEC proceedings, both in federal court and in the SEC's administrative forum.  These are just some of the consequences that Brian will have to endure for the remainder of his life as a convicted felon.  In light of these substantial consequences and given Brian's lack of criminal history, a sentence of probation is sufficient to promote specific deterrence. *See* U.S. SENTENCING COMM'N, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders (Mar. 2017) (observing that individuals with no criminal history

---

[2]  *See, e.g.*, Law 360, "NJ Man Cops to Insider Trading in Atty Info-Poaching Case," (Nov. 14, 2022), available at: https://www.law360.com/pulse/articles/1549285/nj-man-cops-to-insider-trading-in-atty-info-poaching-case.

points pose the lowest risk of recidivism).[3]

A non-custodial sentence coupled with community service also provides for significant general deterrence.  The long-term consequences of Brian's conduct—especially his lifetime status as a felon, forthcoming SEC bar, and the profound shame that Brian brought upon his family—will effectively deter other individuals from similar conduct.  The Court should also consider the general deterrence value provided by any potential future sentence on Brian's co-defendants.  Under these circumstances, imposing a sentence of imprisonment on Brian will not materially enhance the deterrence value of this prosecution.[4]

*Third*, there is no reasonable argument that the public requires protection from Brian.  *See* 18 U.S.C. § 3553(a)(2)(C).  As the Probation Office correctly observes, "the instant offense is non-violent in nature" (PSR ¶ 83), and Brian's letters of support depict a fundamentally kind and decent man.  *See generally* Ex. A.

*Fourth* and finally, a custodial sentence would not further the objective of providing correctional treatment.  *See* 18 U.S.C. § 3553(a)(2)(D).  As noted in the PSR, Brian does not suffer from any physical, mental, emotional, or substance abuse issues.  PSR ¶¶ 45-51.  Although he has not received any mental health treatment in the past, Brian "expressed being open to counseling" (*id.* ¶ 48) to cope with the consequences of his crime.

A sentence of probation adequately reflects the seriousness of Brian's offense and has substantial deterrence value.  A sentence of incarceration would not meaningfully add to the

---

[3]  United States Sentencing Comm'n, "The Past Predicts The Future: Criminal History and Recidivism of Federal Offenders," (Mar. 2017), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12).

[4]  We also note that the efficacy of general deterrence finds questionable support in the authoritative literature.  *See* Gary Kleck, et al., *The Missing Links in General Deterrence Theory*, 43 Criminology 623 (2005) (finding "generally no significant association between perceptions of punishment levels and actual levels" and suggesting that "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms.").

deterrence value or further any other objective of sentencing.  It would, however, impose an annual cost on the public of approximately $44,258.  *Id.* ¶ 77.  We respectfully submit that the public interest is far better served by permitting Brian to provide for his daughter, care for his parents, as well as live and work in his community.

> ### C.     The Need to Avoid Disparities

Based on his false statements to FBI agents and deletions of text messages, Brian has pled guilty to accessory after the fact to a conspiracy to commit insider trading.  A non-custodial sentence would achieve sentencing parity with defendants who committed similar conduct.  By contrast, a custodial sentence would punish Brian more severely than many defendants convicted as principals in insider trading schemes.

Applying the § 3553(a) factors, district courts in the Second Circuit have imposed sentences of probation on first-time offenders who destroy documents and mislead law enforcement.  For example, in *Rhodes*, a corrections officer falsified documents in an effort to obstruct a Department of Justice ("DOJ") criminal investigation regarding allegations that other corrections officers assaulted an inmate.  *United States v. Rhodes*, No. 8-cr-806-02, 2010 WL 1254106, at *1 (E.D.N.Y. Mar. 29, 2010).  The officer also falsely told Special Agents with the DOJ's Office of Inspector General that he did not witness the alleged assault.  *Rhodes*, who committed these crimes from a position of public trust, was convicted by a jury of violating 18 U.S.C. §§ 1519 and 1001, and faced a Guidelines range of imprisonment of 27 to 33 months.  In sentencing *Rhodes* to three years of probation, the late Judge Weinstein pointed to several factors in his background that made it "unlikely that he will engage in further criminal activity."  *Id.* at 3-4 ("The sentence will send a clear message that any involvement in obstruction of justice will result in a substantial penalty.  Specific deterrence is achieved through the supervision of the Probation Department and the impact of this conviction on the defendant's employability.").  Brian

is similarly unlikely to commit further crimes, and should not be punished more harshly than a law enforcement officer who alters documents and lies to law enforcement to cover up criminal deprivations of constitutional rights under color of law.[5]

A sentence of probation would promote parity between Brian and other first-time offenders who engaged in obstructive conduct.  It would also ensure that Brian is not sentenced more harshly than defendants convicted of insider trading—the "underlying offense" to which Brian was an accessory after the fact.  *See* Guidelines, Chapter 2, Part X §2X3.1, Application Notes (noting that accessory after the fact reflects "reduced culpability" compared with the underlying offense).

Individuals who were charged as principals in insider trading schemes and whose conduct was far more egregious than Brian's have routinely received non-custodial sentences.  This is true even where, for example, defendants: brazenly trade in advance of five separate deals, generate $1.1 million in unlawful profits, and obstruct law enforcement investigations (four years of probation with one year of home confinement); steal deal-related information from an investment bank from a position of trust within months of starting employment (five years of probation); or participate in a long-running conspiracy involving multiple tips of confidential information, reaping over $4.3 million in unlawful gains (five years of probation).[6]  Imposing a custodial

---

[5]  There are numerous additional examples of district courts within the Second Circuit sentencing defendants to probation for obstructive conduct.  *See, e.g.*, *United States v. DeFilippo*, 795 F. App'x 3, 5 (2d Cir. Nov. 6, 2019) (Amtrak police officer convicted of wire fraud, conspiracy, and false statements for submitting falsified documents and lying to agents; sentenced to two years' probation); *United States v. Brettschneider*, 832 F. App'x 14, 16 (2d Cir. Oct. 16, 2020) (attorney convicted of conspiracy and false statements for procuring and submitting a false letter to the court for sentencing and lying to Bureau of Prisons officials; sentenced to four years' probation and community confinement); *United States v. Polos*, No. 15-cr-692, 2017 WL 495507 (S.D.N.Y. Feb. 6, 2017) (Assistant Special Agent-in-Charge of Drug Enforcement Administration's New York Field Office and Telecommunications Specialist both convicted of making false statements on security clearance forms and conspiracy; each sentenced to probation for one year).

[6]  *See United States v. Stewart*, No. 15-cr-287 (S.D.N.Y. May 4, 2016) (defendant generated $1.1 million trading on tips from co-defendant son regarding five upcoming transactions, falsely told FINRA that he conducted his own research, and transacted in the account of a friend to avoid detection; sentenced to four years' probation); *United States v. Tsai*, No. 19-cr-675 (S.D.N.Y. Jan. 17, 2020) (defendant generated approximately $100,000 in profits by trading in advance of acquisition that he learned of while employed as an investment banker; sentenced to five

---

15

sentence on Brian would create an unwarranted disparity with these individuals and many other defendants including:

| Case | Defendant/Relationship with Tipper | Illicit Gains | Guidelines Range (if known) | Sentence |
|------|-----------------------------------|---------------|----------------------------|----------|
| *Goerhing*, 5-cr-209 (S.D.N.Y.) | Corporate communications director | $94,000 | 10 to 16 months | 2 years of probation (including 5 months' home confinement) |
| *Perez*, 17-cr-538 (D.N.J.) | Neighbor | $157,000 | Not available | 12 months of probation |
| *Richard Yu*, 17-cr-349 (D.N.J.) | Friend | $200,000 | Not available | 12 months of probation |
| *Chiang Yu*, 17-cr-348 (D.N.J.) | Father | $95,000 - $150,000 | Not available | 12 months of probation |
| *Bonthu*, 18-cr-237 (N.D. Ga.) | Software development manager | $76,000 | 12 to 18 months | 8 months of probation (including 8 months of home confinement) |
| *Blythe*, 16-cr-1842 (S.D. Cal.) | Brokerage customer | $41,000 | Not available | 5 years of probation; 270 days in residential reentry center |
| *Peltz*, 21-cr-154 (E.D.N.Y.) | Financial services firm manager | $1.1 million | 37 to 46 months | 5 years of probation |
| *Catenacci*, 21-cr-759 (N.D. Ill.) | Oncology professor | $134,000 | 15 to 21 months | 1 day of imprisonment; 1 year of supervised release |
| *DeCinces*, 12-cr-269 (C.D. Cal.) | Former MLB player | $1.3 million | Not available | 1 day of imprisonment; 2 years of supervised release |

years' probation); *United States v. Holzer*, No. 9-cr-470 (S.D.N.Y. Oct. 1, 2009) (attorney at international law firm received material nonpublic information from wife of consultant on multiple occasions, which generated over $119,000 for the attorney and $4.3 million for the entire conspiracy; sentenced to five years' probation).

As these matters demonstrate, a custodial sentence would punish Brian more severely for accessory after the fact to an insider trading conspiracy than numerous individuals were punished as principals.

While the sentencing analysis is, by necessity, both fact and defendant specific, downward variances in white collar cases are animated by a premise that has now become uncontroversial: loss amount guidelines are a poor proxy for the seriousness of a crime or a defendant's culpability. As explained by Judge Rakoff in one of the most high-profile insider trading prosecutions in history:

> Another example of the deviation of the Guidelines from the original goals of the Sentencing Commission … is the huge increase in the recommended Guidelines sentences for securities fraud cases.  The Guidelines calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data.

*United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

The disproportionate focus on economic losses is a "fundamentally flawed" approach to fashioning a just sentence in securities fraud cases generally.  *Corsey*, 723 F.3d at 380 (Underhill, J. concurring).  In recognition of these flaws, in recently sentencing a defendant who pled guilty to commodities fraud, Your Honor observed that "perhaps the fraud guidelines put entirely too much emphasis on the amount of the fraud" and that defendant, who had generated $3.5 million in profits, was "as culpable with respect to the $3.5 million as it would be to, you know, $30,000 or $3,000… ."  *United States v. Thompson*, No. 19-cr-698, Dkt. No. 49 (S.D.N.Y. Feb. 4, 2021).[7] But this fundamental flaw is compounded even further in insider trading cases because the amount

---

[7]   In *Thompson*, defendant, from a position of trust, engaged in a scheme to defraud a company of more than $3 million in connection with a Bitcoin investment.  Although defendant's Guidelines range was 37 to 46 months imprisonment, Your Honor sentenced him to time served and three years of supervised release in light of the Guidelines' disproportionate emphasis on loss, the non-violent nature of the crime, defendant's lack of criminal history, and the COVID-19 pandemic.  *See Thompson*, No. 19-cr-698, Dkt. No. 49.

of a defendant's illicit profits is determined, in part, by market forces beyond a trader's control. And unlike in other fraud cases, inside traders generally do not harm individual investors. *See* Barry Boss and Kara Kapp, How the Economic Loss Guideline Lost its Way, and How to Save It, Ohio St. J. Crim. Law. Vol: 18:2: 605-631, 616 (Spring 2021) (noting that loss calculation often does not correspond to loss experienced by an actual victim).

Brian is being held accountable as an accessory after the fact to an insider trading conspiracy through which his brother and Markin generated more than $1.4 million in illegal gains. *See* Dkt. No. 38 ¶ 1. Those profits catapult Brian's Guidelines range up by 14 levels. *See supra* at 5. Under the Guidelines, Brian is treated no differently than a fraudster who, for example, swindles a retail investor out of $1.4 million in retirement savings. That reality alone demonstrates that the Guidelines are of limited utility in fashioning a just sentence for Brian. *See Gupta*, 904 F. Supp. at 351 ("[T]he numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice.").

### D.     The Need to Provide Restitution

Although the Probation Office does not recommend any restitution (PSR ¶ 78), Brian has consented to a money judgment forfeiting the entirety of his $403,000 in unlawful gains. Brian paid $100,000 prior to sentencing, and currently owes approximately $304,000 to the Government. To pay this substantial balance, Brian will need to generate income from the sale of real property and will also need to rely on his salary and tip income as an Uber driver. Permitting Brian to continue working will enable him to repay his forfeiture sooner and to continue to provide financial support to his family.

### E.     The Section 3553(a) Analysis Weighs
   Heavily in Favor of a Non-Custodial Sentence

As we believe is evident from the entirety of the record before the Court, Brian is, at bottom, a good person.  He is remorseful for his crime and will live with its severe consequences for the remainder of his life.  He will also have to forever bear the emotional burden of knowing that his conduct shamed the Wong family—especially his parents, who immigrated to the United States with the dream of making a better life for Brian and Brandon.  This heavy emotional burden would, of course, be heightened if Mr. Wong's health deteriorated while Brian and Brandon are imprisoned.

Besides the flawed advisory Guidelines range, there is simply no component of the § 3553(a) analysis that weighs in favor of imprisoning Brian.  Brian has already been punished severely, and a sentence of probation will substantially restrict his liberty.  There is no credible argument that Brian is likely to commit further crimes, and the deterrence value of this case will not be meaningfully enhanced by imposing a sentence of incarceration.  A sentence of probation will enable Brian to continue being a devoted father to HW, focus on his relationship with his partner, care for his parents, pay his debt to the community by performing community service, and continue his new career as an Uber driver.

Coupled with the nature of his offense, Brian's lack of criminal history, demonstrated remorse, and acceptance of responsibility warrant leniency.  Brian's life has been defined by compassion and kindness to others—his brother, friends (and their children), parents, partner, and especially his young daughter.  As he stands before the Court on this day of judgment, we humbly and respectfully ask the Court to be guided by that same sense of compassion and kindness and impose a sentence that is just, right, and fair.  *See Gupta*, 904 F. Supp. 2d at 354 ("[O]n this day of judgment, must not one judge the [defendant] as a whole?").

**CONCLUSION**

For the foregoing reasons, we respectfully request that the Court sentence Brian to an appropriate period of probation accompanied by community service.

Dated: New York, New York
        March 29, 2023

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: _____

David Oliwenstein
John Van Son
31 West 52nd Street
New York, NY 10019-6131
212.858.1000

*Attorneys for Brian Wong*

20

# EXHIBIT A

02.27.2023

Dear Judge Ramos

My name is Janet Thai, I was Brian Wong's domestic partner. We have been together for nearly 22 years, we have a daughter name H████ W███, she is currently 15 years old. I understand Brian has pleaded guilty to a crime and he is being sentenced to this case.

I am writing this letter to let you know that Brian is a very good man and he does not deserve to be held in prison. He is a great father to my daughter and a good partner. If he have to serve his time in prison, our family will be in very bad position. When this case has happened in late 2021; it have changed our lives. It have developed mental and emotional stress to this family. I do feel Brian have regretted for the mistake he have caused. Currently we are having financial difficulties and are trying to hold up our living expenses and payments. Brian has lost his job since late December of 2022. Currently he is working as an Uber driver trying to earn money to pay for his lawyer fees. Additionally we're selling all of our assets to pay for this mistakes he have caused.

Brian has been a responsible person, he takes care most of the major house work and paper-works needed to be done in the house. As a father, he has been helping our daughter with school work and after school activities. All of our daughter's friends and family knows Brian was being around. And our daughter cannot foresee her father being keep in prison in the future. I am writing this letter to kindly ask you to consider giving Brian a chance not to be lock in prison.

Sincerely

Janet Thai

Honorable Judge,

      I am the father of Brian Wong. I am 77 years old. Our family of four immigrated from Hong Kong to New York in January of 1986, where we started our new life. My wife and I worked hard to save up some money, and bought a house under Brian Wong's name. I cannot read English, so we used his name for the ease of managing it and collecting rent. My son is kind and cares for his parents, so I am at ease doing so. As I started to peacefully enjoy my remaining years, I unfortunately got stage 4 lung cancer. I called my doctor to inform him of the situation. He said he could not see me and asked me to stay at the hospital because the pandemic was at its high during that time. I was in despair. Thankfully, my son found a cancer hospital and brought me to the first visit with the doctor on May 19, 2020. I later received chemotherapy. During that time, I visited the hospital twice a week. My son did go with me. Two months later, he needed to go back to his job and could not take too many days off, so I started going to the doctor and chemotherapy by myself thereafter. To this day, he still calls me every night asking me how I am doing. He is a great son. He made a mistake in this incident because of his complete lack of common sense and unawareness. I am sorry. I humbly ask that you give him another chance and lighten his penalty. Thank you.

Father: Yah Sing Wong
Mother: Yee Chun Wong
2/16/2023



AMERICAN LANGUAGE SERVICES

*Making the World Smaller*

## CERTIFICATION OF TRANSLATION
AFFIDAVIT FOR TRANSLATION OF SAID DOCUMENT

American Language Services, a company specializing in the translation of documents, certifies the following:

- American Language Services has retained a professional translator for the attached  Traditional Chinese
  into      English      document.  The document is referred to as:

### "UNITED STATES V. WONG (22-CR-395)"

- I affirm that such translation has been prepared by a duly qualified translator, who has confirmed that
  such translation is, to the best of their knowledge and belief, a true and accurate translation
  in       English       of the corresponding  Traditional Chinese  document.

- I declare under the penalty of perjury under the laws of the State of California that the foregoing is
  true and correct. Notwithstanding the foregoing affirmations, no liability is assumed for errors and
  omissions in the translation of the attached document.

- Executed on this      Sixteenth    day of      February   , 2023 at Los Angeles, California.


REUBEN TRUJEQUE
AMERICAN LANGUAGE SERVICES

ata MEMBER
American Translators Association

Member # 244894

1849 SAWTELLE BLVD. SUITE 600      LOS ANGELES, CALIFORNIA 90025
TEL (310) 829-0741 FAX (310) 829-3222
translation@alsglobal.net
www.alsglobal.net

3

**CALIFORNIA JURAT**                                        GOVERNMENT CODE § 8202

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of   LOS ANGELES

Subscribed and sworn to (or affirmed) before me on

this __16th__ day of __February__, 20 __23__, by
    Date          Month             Year

(1) _____REUBEN TRUJEQUE_____

(and (2) _____),
                  Name(s) of Signer(s)

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

**NANCY ZUNIGA**
COMM. #2360765
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires June 11, 2025

Signature _____

*Place Notary Seal and/or Stamp Above*                   Signature of Notary Public

---------------------------- **OPTIONAL** ----------------------------

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: ____"UNITED STATES V. WONG (22-CR-395)"____

Document Date: ____See attached____ Number of Pages: ____1____

Signer(s) Other Than Named Above: _____

©2019 National Notary Association

法官大人.

　我是 Brian WONG 的父亲. 今年 77 岁. 我们一家四口
在 1986 年 1 月 从香港移民到纽约. 开始新生活. 我与太太
辛勤工作 积蓄些钱. 买了些房屋用 Brian WONG 的名字买的.
因我不識英文 才用他的名字. 方便管理及收租. 我的兒子
很善良又孝顺的. 我可以放心. 在我很开心安享晚年時.
在二年半前 不幸得了肺癌第四期. 当時我打电訊給我的醫生
告知我的情況. 他說不能見我 要留在医院. 因为当時正是
新冠病毒高峯期. 我听后感覚很绝望. 幸好我兒子找到
一间癌症医院. 在 5月19日2020年 第一天去見医生 然后 做化療.
当初每星期去二次. 我的兒子有陪我去. 2个月后 他也要
返工 不能請太多假. 之后我自己去見医生及化療. 到現在
他每天晚上都有打电話給我 问候一切. 他是一个很有
孝道的兒子. 在今次发生的事故里. 完全没有常識及
不知情下 犯了錯. 对不起. 請法官大人給他一次机会.
从輕发落. 多謝你。

父亲: 黃祐咸<br>
WONG YAU SING

母亲: 黃綺玲<br>
WONG YEE CHUN

2/16/2023

February 14th, 2023

TO: Judge Ramos,

This letter is to verify that I am aware of Brian Wong's felony act and plead guilty to his crime in federal court. I am aware this letter is being submitted to a court in connection with his sentencing.

I have known Brian for over 10 years through a family friend and from the time I first met him to the present time, he has always been someone who was reliable, responsible and always willing to offer a helping hand. He would go out of his way to make sure my family and I were safe in multiple occasions such as checking my vehicle for any wear and tear damages and making sure my vehicle was safe since automobiles are a hobby of his. Anytime he would receive a vehicle safety update, he would message me to make sure I am aware of it.    He is very well liked by his friends and family and my kids are always wondering when they are going over to his house as he spends his time interacting with them in positive ways. He gave them multiple education videos geared towards children for them to use and study. He is someone that has proved himself to be someone dependable and someone I can reach out to if needed. He is one of those people that you know will always return your call and spend his time to talk things through. He is overall a very caring and positive person.

I believe that this crime he committed is out-of-character of his personality and I am not sure if he totally was aware of his wrongdoing. I believe based on the current situation, he has truly learned from his mistake and has had many sleepless nights from this. This has really affected his life, his family and I am hoping there could be a positive outcome to this where it can free his mind.

Sincerely,

Kevin Tin

Dear Honor Ramos:

Hello, my name is Jacky Yeung. I've known Brian Wong and his family for more than 30 years now. Brian and I went to the same local high school together in Brooklyn, New York. We have been friends for a long time and to me, your honor, he's like a family member.

Brian and I were not only good friends, we were work colleagues for many years. We went to the same specialized technical school together and we worked together for at least eight years. With that said, I've known Brian very well.

As a co-worker, Brian is someone who is always willing to work hard, strives to achieve his goals, a complete team player and a mentor to others at work. He would never say no and always willing to help others if needed.

On a personal level, Brian is someone who is trustworthy and supportive to this family, friends and community. He's a great son and definitely a wonderful father. No matter how busy Brian is during his week at work, he would always try to spend time with his daughter and his parents and other family members. Brian is a family-oriented person and truly a wonderful human being.

Lastly, Brian has never committed a crime or hurt anyone as long as I know. He's a stand up citizen, a good friend, a great father, and a wonderful brother and son to his parents. Every one of us is very saddened that Brian made this mistake of Accessory After-the-Fact. It is very uncharacteristic of him and I'm very positive Brian is remorseful for this crime. Your Honor, please allow Brian to make it right and give him a second chance. Thank you very much for taking your time to read this letter.

Sincerely,

Jacky Yeung

Harry Lee MD



Closter  NJ

Honorable Edgardo Ramos
Federal District Judge
United States District Court-Southern District of New York

Dear Judge Ramos:

My name is Harry Lee.  I am a physician in New York City and have been in
practice for almost 30 years.  I am also Brian Wong's uncle by marriage.  I am
married to the younger sister of Mr. Wong's mother and I am writing this letter
on Mr. Wong's behalf.

I have known Brian since he was 11 years old and he was a new immigrant to the
United States.  I have watched him grow from a boy, to a young man, and to an
adult, husband and father.  I have spent a lot of time with him in his home, my
home as well as the golf course.  Through the years I have watched Brian be a
fantastic older cousin to my 3 children as well as to the other nieces and nephews
in the family.  I have witnessed his being a doting father to his daughter H█████.  I
have seen him work alongside his wife Janet in providing for his family.  He has
always been generous with his time and otherwise.  Brian was always available for
advice and guidance to my children.  When my son was in need of a car to get
back and forth to college, Brian "sold" him a used car that he had for $1000 so
that my son Matthew would not just be gifted a car.  But Brian had the oil, brakes
and tires changed before handing over the car to make sure it was safe and that
he would not have any imminent repair costs.  This cost more than what he
charged for the car.

I realize and understand that Brian has committed a crime and has plead guilty to essentially lying to the FBI (I don't recall the official charge). I understand the seriousness of this. Upon hearing of his arrest and this situation, I was shocked. It just seemed so out of character to the nephew that I know and love. I have only known Brian to be an upstanding citizen. Unfortunately, sometimes greed can lead to poor judgement, as in this case. I make no excuses for what he has done. But I do know that Brian is deeply remorseful and extremely embarrassed. Brian cares deeply about the family and feels he has let everyone down and is ashamed. I do believe that this experience has impressed upon Brian the costs of illegal behavior. And I would ask for leniency in his sentencing.

In addition, his father has been battling stage 4 lung cancer for the past 3 years. Brian is his father's liaison with the medical team due to his father's limited English. I understand this has nothing to do with Brian's crime, but again, I would ask for some consideration towards leniency in his sentencing.

Regards,

Harry Lee MD